NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| COLLIERS LANARD & | : | Hon. Joseph H. Rodriguez |
| AXILBUND, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 02-6127 |
| | : | |
| LLOYDS OF LONDON, | : | |
| | : | **MEMORANDUM** |
| Defendant. | : | **AND** |
| | : | **ORDER** |

After holding a one day bench trial, the Court requested counsel to submit proposed findings of fact/conclusions of law, or similar memoranda once counsel received the transcript of the proceedings.  In order to arrive at a decision, the Court was required to review numerous documents and in-court testimony.  As a result, the Court had to carefully consider the credibility of the witnesses, all of the evidence and legitimate inferences therefrom, and the arguments of counsel for the parties.  Presently, before the court are the post-trial submissions of the parties.  This Memorandum and Order shall constitute the Court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).  For the reasons that follow, judgment shall be entered against Lloyds of London in favor of Colliers Lanard & Axilbund in the total amount of $247,352.89, less the applicable deductibles under Professional Liability Insurance Policy No. A2000MP00001930, apportioned as follows: $112,062.09 for legal fees and 135,290.80 in settlement fees.

## FINDINGS OF FACT

These findings incorporate those facts stated in the Court's Summary Judgment Opinion dated March 10, 2004.

1.  West Jersey Medical and Professional Plaza, LLC, ("West Jersey") owner of West Jersey Medical and Professional Plaza located in Voorhees, New Jersey ("Plaza"), hired Plaintiff Colliers Lanard & Axilbund ("CL&A") to act as West Jersey's real estate leasing broker.  (Trial Transcript at 20, 75).[1]

2.  CL&A's primary duty was to market the Plaza to obtain tenants for the space. (TT at 20.)

3.  CL&A received a commission for each tenant it obtained, and, as an additional no-charge service CL&A drafted lease agreements between West Jersey and the tenants it secured on West Jersey's behalf.  (TT at 51, 165-167.)

4.  At all relevant times, West Jersey dealt solely with Jason Wolf ("Wolf"), a salesman for CL&A, in drafting these lease agreements.  (TT at 19-20.)

5.  Wolf has a Bachelor of Business Administration degree with a concentration in real estate and business law.  (TT at 19.)  Wolf had training in commercial real estate leases.  (Id.)

6.  On December 7, 1998 and September 14, 1999, Wolf obtained Schaffer Medical Associates ("Dr. Schaffer") and Albert R. Franciscan, M.D. ("Dr. Franciscan")

---

[1]  All cites, unless otherwise indicated, are based upon the trial transcript from the bench trial dated April 18, 2005.  The cites will be annotated as "TT_____."

as tenants for the Plaza.  (TT at 75.)

7.  CL&A prepared the leases on forms provided by West Jersey, but unknown to all parties, essential financial terms were entered incorrectly.  (TT at 23.)

8.  Wolf prepared a "request sheet" that contained the improper terms, and these improper terms.  Specifically, the lease term was intended to be a triple net lease, which meant that the tenant was responsible for paying the operating expenses, or $8.84 per square foot.  The request sheet, however, listed the operating expense at $0.00.  (TT at 21-22.)

9.  Wolf reviewed the leases after they were completed, but did not notice the mistakes.  George Gordon ("Gordon"), vice-president and general counsel of CL&A, also reviewed the leases without noticing the mistakes.  (TT at 22.)

10.   Steven Shapiro ("Shapiro"), the managing member of West Jersey, did not notice mistakes when he reviewed and signed the leases.  (TT at 22-23.)

11.  At some point prior to July, 2000, Shapiro became aware that incorrect terms had been entered into the two leases and discussed the situation with Wolf.  Wolf acknowledged the mistakes.  (TT at 23-24.)

12.  On July 14, 2000, and after consulting with Gordon, Wolf drafted a letter to both tenants to inform them that a "mutual mistake" had been made in the drafting of the leases and to propose a possible remedy.  (TT at 24.)

13.  On July 24, 2000 and August 25, 2000, Dr. Shafer and Dr. Franciscan,

respectively, both denied that there was a mutual mistake and rejected the remedy proposed by CL&A.  (TT at 24-25.)

14.  Upon reviewing Dr. Shafer's July 14, 2000 letter, Gordon stated, "I see [letters] that all the time, it's typically an invitation to negotiate."  (TT at 53-54).

15.  Gordon stated that he "didn't calculate the numbers out [loss rents to West Jersey]" and that litigation was a rare occurrence.  (TT at 53.)  Gordon testified that, "Most landlords and tenants most always settle their disputes."  (Id.)

16.  Gordon testified that he believed that the landlord [West Jersey] would be suing the tenants.  (TT at 56.)  Gordon testified that he "didn't think there was any claims against our company."  (TT at 58.)

17.  On August 29, 2000, Gordon signed a "Real Estate Errors and Omissions Liability Application" for a professional liability insurance policy to be issued by Defendant Lloyds of London ("Lloyds").  It was a "claims made" policy with an effective date of November 4, 2000 and a retroactive date of November 4, 1992.  (See Pl. Exh. 6.)

18.  The claims made application, Question 20 asked, "Is the applicant aware of any act, error, omission or other circumstance which might reasonably be expected to be the basis of a claim or suit against the applicant or anyone indicated in question 9 [CL&A staff] or 10 [CL&A's principal, partner, director and officers]?"  Gordon marked the box for "No."  (Pl. Exh. 6; TT at 43-44.)

19.  Mr. Gordon, was CL&A's in house counsel since 1981, and has been a real estate attorney since 1973.  (TT at 37-38.)

20.  Gordon testified that as of the time he answered "no" he did not expect a claim to be made by West Jersey.  (TT at 43-44.)

21.  Wolf testified that he and Mr. Shapiro [West Jersey] were "clearly on one side . . . almost acting as a 'team' to handle this issue."  (TT at 25-26.)

22.  Gordon testified that he did not believe that CL&A had legal responsibility for the mistake in the lease.  (TT at 43-44.)

23.  When Gordon answered "no," he was aware of at least one tenant who refused to amend its lease.  (TT at 41, 43-44.)

24.  CL&A received a copy of a Professional Liability Insurance Policy, No. A2000MP00001930 on December 18, 2000.  (Pl. Exh. 6.)  The policy covered a one year term beginning on November 4, 2000, with a retroactive date of November 4, 1992.  (Id.)

25.  The policy stated, in relevant part, that coverage would be provided for "claims made against the insured and reported to the company during the policy period arising from services rendered . . . prior to the effective date of this insurance and subsequent to the retroactive date . . . *provided that the insured had no knowledge of any claim or suit, or any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance*." (Def.'s Exh. 5.) (emphasis added)

5

26.  The insurance policy defined "claim" as: (a) a demand received by an Insured for money or services; or (b) a notice received by an Insured alleging a breach of duty by an Insured; or (c) service of suit, or notice received of the initiation of arbitration or other proceedings against and Insured.  (Def.'s Exh. 5.)

27.  West Jersey's counsel sent CL&A a letter dated January 10, 2001, indicating that West Jersey decided to pursue legal relief against all the parties related to the leases, including CL&A.  (TT at 46.)

28.  Gordon testified that up until that point, no one from West Jersey, including Mr. Shapiro, had any conversations with CL&A that sought compensation from CL&A. (TT at 46.)

29.  On January 24, 2001, CL&A was served with a complaint from West Jersey, and on the same day, Gordon informed CL&A's insurance broker of the lawsuit. (Stipulation.)

30.  On February 14, 2001, Lloyds of London, through its claims administrator CD Managers, Inc., denied CL&A's claim for defense and indemnification for the West Jersey litigation.  (Pl. Exh. 8.)

31.  Lloyds claimed that CL&A was "aware of issues or circumstances which 'might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance.'" (Pl. Exh. 8.)

32.  After Lloyds denial of coverage, CL&A answered West Jersey's Complaint and filed a Counterclaim for commissions.  (Stipulation.)

33.  CL&A and West Jersey reached a settlement in which CL&A agreed to offset $135,290.80 owed to it by West Jersey.  (TT at 164.)  CL&A incurred legal fees of $112,062.09. (TT at 130.)  Therefore, CL&A has incurred costs and expenses of $247,352.89 as a result of the West Jersey litigation.

34.  In 2002, Lloyds refused to renew the E&O Insurance Policy issued to CL&A. (TT at 64-65.)

35.  CL&A applied for E&O coverage though The Travelers, and on August 8, 2002, Murray H. Feldman, of CL&A, signed an Application for Insurance.  (Def.'s Exh. at 2.)

36.  Feldman answered "no" to the following questions: "Have any claims been made during the past five (5) years against the applicant or anyone indicated in Question 9 or 10?" and, "During the past five (5) years, has any insurance company declined, cancelled or refused to renew for the applicant or anyone named in Question 10 a policy of real estates agents errors and omissions liability insurance?  (Def.'s Exh. 2;TT 65-66.)

37.  Gordon admits that this declaration was false as it relates to the 2002 Application for Insurance Coverage because it did not correctly reference the West Jersey Complaint filed in January 2001.  (TT at 65-66.)

38.  Gordon did not fill out the 2002 Application for Insurance Coverage.  (TT at

66-67.)

39.  On October 10, 2002, Gordon personally prepared a "Supplemental Claim Information, which stated, "In January of 2000 a claim was made.  It was not covered by the E&O carrier.  The matter was settled between the parties before trial.  (Def.'s Exh. 3, TT at 68."

40.  Gordon admits this statement should have said "January 2001" instead of "January 2000."  (TT at 69.)  Two months later, a corrected page two was sent to the insurance carrier with the corrected date.  (TT at 71-72.)

41.  On December 30, 2002, CL&A filed a Complaint against Lloyds of London to recover for the damages it incurred because of Lloyds's denial of its claim for defense and indemnification.  (Stipulation.)

## CONCLUSIONS OF LAW

1.  With respect to contract disputes such as this, the New Jersey Supreme Court has held that "the law of the place of the contract will govern the determination of the rights and liabilities of the parties."  State Farm Mut. Auto. Ins. Co. v. Simmons Estate, 417 A.2d 488 (N.J. 1980). Therefore, New Jersey law applies.

2.  In New Jersey, insurance contracts are subject to special rules of interpretation because they are contracts of adhesion.  Zacarias v. Allstate Ins. Co., 775 A.2d 1262, 1264 (N.J. 2001) (citations omitted). When there is ambiguity, the insurance policy should be interpreted to "comport with the reasonable expectations of the insured, even if

a close reading of the written text reveals a contrary meaning." Id. (citations omitted).

Even in the absence of ambiguity, however, "[u]nder certain circumstances, . . . the plain

meaning of policy language may be overcome if it conflicts with the reasonable

expectations of the insured." Am. Motorists Ins. Co. v. L-C-A Sales Co., 713 A.2d 1007,

1013 (N.J. 1998) (citation omitted).

     3.  With regard to insurance policy exclusions, the New Jersey courts have held

that they must be narrowly construed and that the burden is on the insurer to bring the

case within the exclusion. Am. Motorists Ins. Co., 713 A.2d at 1013 (citation omitted).

"Nevertheless, [New Jersey courts] adhere to the principle that an insurance policy should

generally be interpreted 'according to its plain and ordinary meaning,' so as not to

disregard the 'clear import and intent' of a policy exclusion." Id. (citations omitted).

     4.  Therefore, exclusions in claims made professional liability insurance policies

do not violate public policy and are uniformly upheld.  See generally Zuckerman v. Nat'l

Union Fire Ins. Co., 495 A.2d 395 (N.J. 1985).  The Zuckerman court explained the

reasoning and purpose of claims made policies:

> The reasonableness of excluding claims based on prior conduct that the
> insured could reasonably have foreseen might serve as the basis for a future
> claim is apparent.  The insurance company is entitled to protect itself
> against the professional who, recognizing his past error or omission, rushes
> to purchase a "claims made" policy before the error is discovered and a
> claim asserted against him.

Id. at 404 n.3.

5.  As was stated in <u>Am. Motorists</u>, the burden is on Lloyds of London to prove that CL&A's claim falls within the insurance policy exclusion.  To do this, it must be determined whether the application question and policy exclusion are subjective or objective.  The distinction between subjective and objective insurance policy application questions has been discussed in cases involving rescission of insurance policies based upon the doctrine of equitable fraud.

6.  Application of this principle under New Jersey law is the case <u>First American Title Ins. Co. v. Lawson</u>, 827 A.2d 230, 233 (N.J. 2003), where a professional liability insurance application asked, "After inquiry, is any attorney in your firm aware of: . . . Any acts, error or omissions in professional services that may reasonably be expected to be the basis of a professional liability claim?"  The insured answered "no" and subsequently re-affirmed that answer a year later.  <u>Id.</u> at 233, 234.  Prior to re-affirming its answer to the policy question, however, the insured received notice from the Office of Attorney Ethics that the OAE would be conducting an audit of the insured-firm's books because it had received three grievances concerning the firm's handling of certain real estate transactions.  <u>Id.</u> at 234.  As a result of the firm's "numerous defalcations," the title company for those real estate transactions had to pay claims to various individuals, and sought recovery from the firm.  <u>Id.</u>  The firm, in turn, then sought coverage from its professional liability insurance carrier.  <u>Id.</u>  The insurance company denied the firm's claim and filed a declaratory judgment action alleging that the insured's policy was void

10

because of the insured's material misrepresentation on the insurance application.  Id. at

235.  To decide whether the policy was void based on equitable fraud principles, the court

considered that the application question called for subjective information.  Id. at 237.  The

court explained, "Examples of subjective information include when an insurer asks an

insured to indicate a belief about the status of his or her health, or when, as here, an

insurer asks whether an applicant 'is aware of any circumstances which may result in a

claim being made against the firm.'"  Id. at 237 (citations omitted).  The court found that

the insured falsely represented that the firm was unaware of "any acts, error or omissions

in professional services that may reasonably be expected to be the basis of a professional

liability claim," because it was notified of the OAE investigation prior to its re-

affirmation of the application question.  Id. at 239.  The court upheld the appellate court's

determination "that no reasonable factfinder could conclude anything other than that [the

insured] knew his [answers and statements] to be false."  Id.  (citation omitted).

        7.  Similarly, in Liebling v. Garden State Indemnity, 767 A.2d 515, 517 (N.J.

Super. Ct. App. Div. 2001), an insured answered "no" to the question, "Is the firm aware

of any circumstances, or any allegations or contentions as to any incident which may

result in a claim being made against the firm?"  The claims made malpractice insurance

policy also included an exclusion that stated, "We do not insure here any claim . . . of

which: . . . Any insured, at the inception date of this contract, knew or reasonably could

have foreseen that any such act, error, or omission might be expected to give rise to a

claim otherwise insured here." Id. at 522.  The insured was sued by a former client

because the client's case was dismissed for the insured's failure to sue the proper parties.

Id. at 518.  The insured sought coverage under his professional liability insurance, but the

insurance company denied his claim for coverage.  Id.  The insured then filed an action

for declaratory judgment.  Id.  The insurance company asserted equitable fraud as an

affirmative defense and demanded rescission of the policy because it determined that the

insured's answer on the insurance application was a material misrepresentation.  Id.  The

insurance company also argued that it was not required to provide coverage under the

policy's exclusion.  Id. at 522.  Under an equitable fraud analysis, the court first explained

the difference between subjective and objective questions.  "An objective question [is]

one calling 'for information within the applicant's knowledge' and a subjective question

[is] one that 'seek[s] to probe the applicant's state of mind.'"  Id. at 518 (citing Ledley v

William Penn Life Ins. Co., 651 A.2d 92, 96 (N.J. 1995)) (other citations omitted).

    8.  The Liebling court then determined that the application question and policy

exclusion were both subjective, and stated that if the insured "honestly believed that a

malpractice claim was unlikely, his negative answer to the question posed in this case is

not a misrepresentation."  Id. at 522.  Concerning the policy exclusion, the court stated

that "the issue is not what a reasonable attorney would have believed but what he in fact

believed."  Id. at 524.  The court determined that "not only would no reasonable attorney

have felt secure from a claim but that [the insured] did not honestly believe that he was

secure." Id. at 525.  Consequently, the court held that the insured's answer to the application question was knowingly false, and the insurance company was entitled to rescind the policy based on equitable fraud.  Id.  For the same reasons, the insurance policy exclusion also jusified the insurance company's denial of coverage.  Id.

9.  Similar to the insurance policy in First American and Liebling, the application question, as well as the policy exclusion asked Gordon to reveal whether he had "knowledge of any claim or suit, or any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance."

10.  The first part of the question--whether Gordon had information of any act, error, or omission within his knowledge--is objective.

11.  The second part--whether Gordon reasonably expected this information to result in a lawsuit--is a subjective question that sought to probe his state of mind. According to the dictates of Liebling, whether the policy exclusion applies here depends on what Gordon "in fact" believed, and not on the fact that he is an attorney or that he has significant real estate lease experience.

12.  It bears repeating that New Jersey courts have held that insurance policy exclusions must be narrowly construed and that the burden is on the insurer to bring the case within the exclusion.  Am. Motorists Ins. Co., 713 A.2d at 1013 (citation omitted).

13. Lloyds has failed to satisfy its burden because the weight of the evidence at trial indicates that Gordon honestly believed that a legal claim was unlikely; as such his

negative answer to question posed in this case is not a misrepresentation.  See Liebling, 337 N.J. Super. at 459.

14.  As of August 29, 2000, Gordon can only be charged as knowing that one of the tenants did not agree with West Jersey's interpretation of the contract.

15.  Lloyds has not proffered evidence that Gordon's knowledge changed up until the point he received the policy application of December 18, 2000.

16.  Gordon's knowledge, therefore, could not "reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance."

17.  The record does not indicate that Mr. Shapiro or West Jersey told Gordon, Wolf, or anyone at CL&A of its intention to file a Complaint, or pursue any legal remedy against CL&A, until nearly six (6) months after Gordon answered "no" to Question 20.

18.  The record supports an opposite conclusion; namely, that when Gordon answered Question 20, West Jersey and CL&A were working together "as a team" to fix the error in the leases.  (TT at 25-26.)

19.  The record at trial does not demonstrate that Gordon's answer to the application question was knowingly false.

20.  As such, Lloyds was not entitled to rescind the policy, and its denial of coverage constitutes a breach of contract under New Jersey law.

21.  In Griggs v. Bertram, 443 A.2d 163, 172-73 (N.J. 1982), the New Jersey Supreme Court held that an insurer that wrongfully refuses to defend is liable for a "reasonable settlement entered into in good faith by its insured."  Id.  The insured has the

burden of producing evidence showing that the settlement was *prima facie* reasonable, but the insurance carrier has the ultimate burden of demonstrating that the settlement was neither reasonable nor reached in good faith.  See id.; Battista v. Western World Ins. Co., 545 A.2d 841, 848 (N.J. Super. Ct. Law Div. 1988).

22.  In New Jersey, there exists a strong public policy in favor of settlements. Zuccarelli v. State Dept. of Envtl. Prot., 741 A.2d 599 (N.J. Super. Ct. App. Div. 1999), cert. denied, 749 A.2d 368 (2000).

23.  Pursuant to Griggs, it is the Court's obligation to conduct an independent review of the settlement in order to determine whether it is reasonable and made in good faith.  See Fireman's Fund Ins. Co. v. Imbesi, 826 A.2d 735, 750 (N.J. Super. Ct. App. Div. 2003).

24.  In deciding whether a settlement is prudent and reasonable, a court must consider the risk to the settling parties.  Vargas v. Hudson County Bd. of Elections, 949 F.2d 665, 674 (3d Cir. 1991).  It is the extent of the insured's exposure to liability and not mere allegations in the injured party's complaint that govern the appraisal of reasonableness.  See id.  In Vargas, the district judge reviewed the settlement negotiations, and found that they were fair and reasonable.  Thus, on appeal, the insurer had "a particularly difficult task" in demonstrating unreasonableness, and ultimately failed in his attempt.  See id.

25.  Like Vargas, the Court reviewed the settlement between West Jersey and CL&A, two sophisticated business entities, who through their attorneys, were able to

consider the risks and liabilities and settle the matter without proceeding to trial.

26.   The testimony at trial convincingly proved that it was  "reasonable settlement entered into in good faith by its insured."  See Griggs, 443 A.2d at 172-73.

27.   Gordon testified that the settlement negotiations took eight to ten months.  (TT at 163.)  The parties sought a "global settlement," whereby West Jersey would pay CL&A for future commissions owed and CL&A would pay West Jersey for lost rents.  (Id.)

28.   Gordon testified that he and the West Jersey attorneys went over the terms "item-by-item" and based the dollar amounts on "firm terms."  (See TT at 165-166.)

29.   Lloyds accepted the attorney fees of $112,062.09 as reasonable at trial.  (TT. at 130.)  Undeniably, CL&A's attorney fees would have been considerably more had it not settled with West Jersey, and proceeded to trial.

30.   It is undisputed that CL&A drafted leases for two tenants that contained incorrect financial terms resulting in financial loss for West Jersey.

31.   The "mistake" to West Jersey was estimated at $214,528.00.   CL&A calculated that it was due $247,398.00 from West Jersey in lost commissions.  CLA assumed $135,290.80 of the liability, thus CL&A recovered $112,107.20.

32.   The risk for liability as against CL&A was high as it was responsible for the drafting error.  Further, it is likely that a trial jury would have concluded that CL&A's drafting error was the cause of the negligence damages sought by West Jersey.

33.   The size of potential recovery (approximately $350,000 sought by West Jersey in the underlying suit), as compared to the amount that CL&A was actually out of pocket

16

$349,818, coupled with the degree of probability of West Jersey's success on its claim, points to the conclusion that the settlement appears to be reasonable.

34.  Lloyds has not proffered allegations of collusion, nor could any inference of collusion be drawn from the record.

35.  In consideration of the risk, exposure of liability, the amount in controversy, the extent and duration of the negotiations, and the lack of collusion, the Court finds the settlement was made in good faith and was reasonable.

Accordingly,

For the reasons expressed above,

**IT IS HEREBY ORDERED** this 8th day of June 2005, in accordance with the findings of fact and conclusions of law attached in the form of a Memorandum, that Final Judgment be and the same is hereby entered in favor of the Plaintiff and against the Defendant;

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine [33] is DENIED AS MOOT.

**IT IS FURTHER ORDERED** that Lloyds of London will pay the amount of $247,352.89, less the applicable deductibles under Professional Liability Insurance Policy No. A2000MP00001930, to Colliers Lanard & Axilbund within twenty (20) days of the entry of this Order.

/S/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.

17